**JAMES M. KING AND ASSOCIATES, INC., a Minnesota corporation, Plaintiff,**

v.

**G.D. VAN WAGENEN COMPANY, a Minnesota corporation, Action Financial Services, Inc., an Illinois corporation, Central National Insurance Company of Omaha, a Nebraska corporation, National Underwriters, Inc., a foreign corporation, Dependable Insurance Company, a foreign corporation, St. Regis Insurance Group/Drum Financial Corporation, a foreign corporation, Defendants.**

Civ. No. 4–86–461.

United States District Court,
D. Minnesota,
Fourth Division.

July 5, 1989.

Mark J. Briol, Gregory L. Wilmes, and Fruth & Anthony, Minneapolis, Minn., for plaintiff.

James L. Wahlfors, Ronald H. Groth, and Thomson, Wahlfors, Moran & Groth, Ltd., Minneapolis, Minn., for defendant G.D. Van Wagenen.

Bradley G. Clary, Marko J. Mrkonich, and Oppenheimer, Wolff & Donnelly, St. Paul, Minn., for all defendants except G.D. Van Wagenen.

## ORDER

DOTY, District Judge.

This action arises out of alleged wrongful actions taken by defendants to prevent plaintiff from selling Collateral Protection Insurance [1] (hereinafter "CPI") and Residual Value Insurance [2] (hereinafter "RVI"), underwritten by Central National Insurance Company of Omaha (hereinafter "Central National") or Dependable Insurance Company (hereinafter "Dependable"), to banks in Minnesota. This matter is presently before the Court upon defendants' motion for summary judgment.

Plaintiff James M. King & Associates, Inc. (hereinafter "King Agency") is a small general insurance agency located in Bloomington, Minnesota. Historically, it has had no experience in marketing insurance to financial institutions. In or about November 1982, it responded to an advertisement placed by Action Financial Services, Inc. (hereinafter "Action") for subagents, and was put in contact with Joseph Taborek. Taborek was an area representative for Action. He had approximately 30 other subagents who had been recruited in the same way. On May 27, 1983, King Agency executed a sub-agency agreement with Action authorizing King Agency to market CPI in exchange for a five percent commission. The effective date of the agreement was April 1, 1983.

Defendant Action was and is an insurance agency with principal offices in Los Angeles, California. Action has used Central National as an underwriter for insurance products marketed to financial institutions and has been a managing general agent for Central National. It was Action's practice in 1982 to enter into subagent agreements with certain independent agents and make them area representatives. Some of these agents, such as Taborek, were authorized to use the title "Regional Vice President," although they were not actually employees or officers of Action. It was also Action's routine practice to place advertisements similar to the advertisement to which the King Agency responded for additional subagents. The subagent's function was simply to use per-

---

1. Collateral Protection Insurance insures not only a bank, but also the bank's borrower against the risk of physical damage to collateral—usually an automobile—securing a bank loan, up to the amount of the borrower's outstanding loan balance. Participating bank's loans are matched against proof of the existence of automobile physical damage insurance supplied by borrowers. Computer tracking systems are used for this purpose. Borrowers lacking insurance are notified that Collateral Protection Insurance will be placed on their collateral if they do not supply proof of personal insurance. CPI is then placed on those borrowers not responding to a series of inquiry notices, unless insurance is waived by the bank as to the given borrower.

2. Residual Value Insurance is marketed in connection with balloon car loans. In a closed-end balloon loan, utilizing residual value insurance, the borrower can pay part of the loan principal in his monthly payments and satisfy the remainder (the "balloon payment") by returning the car to the lender at the end of the loan term, instead of making the balloon payments. RVI insures the lender against the risk of excess depreciation of used car prices, which will cause the value of the automobile at the end of the loan period to be less than the balloon payment.

sonal contacts in their area to obtain appointments for sales presentations of Action's insurance products. The actual presentation would be made by the area representative from Action who would be accompanied and introduced by the subagent.

In June, 1983, Action was put up for sale by its then owner, and was acquired by a St. Regis Paper Company subsidiary, Protective Insurance Underwriters. The president of Action thereafter reported to, and was subject to the supervision of, the Marketing Director at Central National. Central National, a small insurance company specializing in the underwriting of insurance products marketed to financial institutions, was, and is, a wholly-owned subsidiary of Drum, which was in turn owned at the time by St. Regis Paper Company. Central National marketed its products through independent managing general insurance agencies such as Action and G.D. Van Wagenen Company (hereafter "Van Wagenen"). Its managing general agencies, including Van Wagenen, in effect operate as branch offices of Central National.

Defendant Van Wagenen was, and is, an established independent insurance agency with principal offices in Minneapolis, Minnesota. It has specialized in marketing insurance products, including CPI, to financial institutions. Van Wagenen in 1982, used Central National as a primary insurance underwriter and has been a managing general agent for Central National. Van Wagenen has operated in fifteen to twenty states, with primary emphasis in Minnesota. In 1984, Van Wagenen began marketing RVI through Central National.

In essence, the relevant dispute is over the legal significance of certain conduct by Central National after acquiring Action in the summer of 1983. At that time, Central National was concerned that its ten to twelve independent managing general agents might view the acquisition of Action by St. Regis as a threat, in that it gave Central National the ability, for the first time, to market CPI directly to financial institutions. Following the acquisition, however, Central National was still dependent on the sales efforts of its independent

agents for much of its gross premium volume. Thus, to alleviate possible concerns, and to avoid the loss of business which would result if the independent agents attempted to transfer their Collateral Protection Insurance accounts to the agents' other underwriters, Central National claims it adopted a policy that Action representatives would not be permitted to solicit the business of any account which was already written through Central National by any of its independent managing general agents. Central National allegedly announced the adoption of that policy to each of its independent managing general agents, assuring each of the independent agents that Action would not be used as a mechanism for acquiring CPI accounts they had already written for Central National.

After the alleged announcement of Central National's policy, Action's agents, on two separate occasions, contacted First Bank Systems in Minneapolis, an existing Central National account handled by Van Wagenen, and made proposals to handle CPI for First Bank. First Bank Systems informed Van Wagenen of the contacts and complained to Central National regarding the CPI sales calls as being an apparent violation of Central National's announced policy. Central National's marketing director James Twiss, informed Larry Probstein, the president of Action, of the complaint and instructed him again that Action representatives should not solicit business already written by Central National through its independent agents.

Subsequently, in April 1984, King Agency's agreement with Action was amended to authorize King Agency to market Payment Shaver RVI in exchange for a five percent commission. Action marketed Payment Shaver RVI as a sub-agent for National Underwriters, with Dependable Insurance as the underwriter. In May 1984, however, King Agency was informed that its authorization to market Payment Shaver RVI within the State of Minnesota or to First Banks or Norwest Banks, wherever located, was terminated.

## DISCUSSION

Plaintiff's principal claim is that defendants have violated § 1 of the Sherman Act, 15 U.S.C. § 1 and Minn.Stat. §§ 325D.51 and 325D.53, subd. 1(3) (1986). Specifically, plaintiff alleges that Van Wagenen, Central National, Action, and Drum conspired in restraint of interstate commerce by agreeing to restrict the sale of CPI to Minnesota banks by anyone representing Central National through Action, other than Van Wagenen. Plaintiff has made a similar allegation against Van Wagenen, Central National, Action, Drum, Dependable, and National Underwriters in connection with Payment Shaver RVI. Plaintiff has also alleged several common law causes of action, namely: that Action breached contracts with the King Agency under which Action was allegedly obligated to provide an underwriter for CPI and RVI policies sold by King Agency; that Van Wagenen, Central National, and Drum interfered with the King Agency's economic relations by inducing Action to breach its CPI and RVI contracts with the King Agency; and that Van Wagenen, Central, Drum, and Action have engaged in unfair methods of competition. Plaintiff initially alleged a violation of § 2 of the Sherman Act, 15 U.S.C. § 2 and Minn.Stat. § 325D.52 (1986) as well as a violation of § 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiff has abandoned those claims. Accordingly, Counts IV and IX will be dismissed with prejudice. Defendants have moved for summary judgment on each of plaintiff's remaining claims.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Once a properly supported motion for summary judgment [3] has been made, the burden is on the nonmoving party to produce some evidence demonstrating the existence of a factual dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by their own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The quantum of proof that the adverse party must produce is not susceptible of precise measurement, but it is clear that the nonmoving party must produce enough evidence so that a reasonable jury could return a verdict for that party. *Anderson,* 106 S.Ct. at 2511.

## I. *Sherman Act Claims* [4]

Section 1 of the Sherman Act provides that "[e]very contract, combination ..., or

3. When the nonmoving party bears the burden of proof at trial, the moving party is not required to support its motion by producing evidence showing the absence of a genuine issue of material fact. It is enough for the nonmoving party to point out that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

4. The analysis of plaintiff's claims under Minnesota Antitrust Law is identical to the analysis of plaintiff's claims under the Sherman Act.

 The Minnesota Supreme Court has consistently held that the Minnesota Antitrust Law should be construed consistently with the federal courts' construction of the federal antitrust laws. *See State v. Duluth Board of Trade,* 107 Minn. 506, 517, 121 N.W. 395, 399 (1909) ("the general purpose of all statutes of

this kind is the same, and we may therefore properly look to the decisions made under federal and state statutes of a similar character for the principle by which to construe our own statute"). *See also Christgau v. Woodlawn Cemetery Association,* 208 Minn. 263, 276, 293 N.W. 619, 625 (1940) ("it would be anomalous to have the state and federal courts applying different rules to the same facts under identical provisions of law"); *Campbell v. Motion Picture Machine Operators' Union, Local 219,* 151 Minn. 220, 228–29, 186 N.W. 781, 783 (1922) (reiterating the *Duluth Board of Trade* rationale). *Keating v. Philip Morris, Inc.,* 417 N.W.2d 132, 136 (Minn.App.1987). Thus, the disposition of plaintiff's claim under Minnesota law will be the same as the disposition of plaintiffs' claims under the Sherman Act.

conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." 15 U.S.C. § 1. Despite language that apparently prohibits any combination of business enterprises that restrains trade, § 1 was intended to prohibit only unreasonable restraints of trade. *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). Thus, with the exception of "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use," *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), courts analyze alleged concerted conduct under the rule of reason standard. Rule of reason analysis requires a case-by-case balancing of the economic effects of the concerted action to determine whether it constitutes an unreasonable restraint on competition. *Business Electronics Corp.*, 108 S.Ct. at 1519. Horizontal restraints are a classic example of a combination that is unlawful *per se, United States v. Topco Assocs.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), while vertical agreements between a manufacturer and distributors to divide markets are typically analyzed under the rule of reason. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568 (1977).

Plaintiff contends that the agreement between Van Wagenen and Central National was horizontal in nature and, therefore, a *per se* violation of § 1 because Action, which was owned by Central National, was a competitor. Apparently, plaintiff's argument is that an agreement with a subsidiary's parent is automatically an agreement with the subsidiary. Defendants respond that there was no agreement between Van Wagenen and Central National, but rather a unilateral statement of policy made by Central National. Defendants, citing *Pink Supply Corp. v. Hiebert*, 788 F.2d 1313 (8th Cir.1986), further assert that even if

there was an agreement, Van Wagenen and Central National were legally incapable of conspiring. Therefore, even if there was an agreement, that agreement was not *per se* unlawful and is subject to a rule of reason analysis. Finally, defendants contend that the alleged agreement must be found lawful under a rule of reason analysis.

The parties' arguments raise four issues: 1) whether there was an agreement 2) whether an agreement between Van Wagenen and Central National could constitute a conspiracy within the meaning of § 1; 3) if there was an agreement restraining trade, whether that restraint was vertical or horizontal in nature; and 4) if it was a vertical restraint, whether it was unreasonable under a rule of reason analysis.

**A. Existence of an Agreement**

■ Plaintiff alleges that defendants agreed at an August 4, 1983 meeting between Kent Daley of Van Wagenen and Frank Barrett of Central National to force King Agency out of Minnesota, or at least prohibit King Agency from contacting any of Van Wagenen's existing Minnesota accounts. To implement the agreement, Central National allegedly promised to refuse to underwrite any CPI policies sold by King Agency to any of Van Wagenen's existing Minnesota accounts. Plaintiff further alleges that this agreement was later extended to include RVI. Central National denies the existence of an agreement between it and Van Wagenen.

According to defendants, Central National's refusal to underwrite policies sold to Van Wagenen clients by Action's agents or sub-agents was based upon a unilateral policy adopted by Central National at the time Action and National Underwriters were acquired. When Action and National Underwriters were acquired, Central National told all of its managing general agents, including Van Wagenen, of Central National's position that, if a managing general agent was writing business with Central National, the Company would not take the business away through Action or National Underwriters. Central National

adopted this policy because it was essential to Central National that its general agents trusted it, since other insurance companies had a reputation of taking business. Since Central National did not have exclusive contracts with its managing general agents and they were, therefore, free to do business with other insurance carriers, Central National did not want its acquisition of Action to prompt its managing general agents to go to other insurance carriers.

The evidence relating to this issue reveals the existence of a genuine issue of material fact as to the existence of an agreement between Van Wagenen and Central National or National Underwriters. In an August 13, 1983 letter from James Twiss, executive vice-president of Central National, to Larry Probstein at Action, Twiss restated that Central National's *"policy* which must be implemented is—no Action employee, subagent or associate shall solicit banks or lending institutions where Central National already has the business through another agency." (emphasis added). Further, Frank Barrett, Central National's vice-president, testified at his deposition that Central National had adopted that policy unilaterally. The alleged policy, however, was never reduced to writing or approved by Central National's executive policy committee nor was Central National's executive vice president and secretary aware of any agent of record policy. Further, plaintiff cites to a statement in a July 27, 1983 internal Van Wagenen memorandum in which Don Miller, Van Wagenen's vice-president and director of marketing, suggested to Kent Daley, Van Wagenen's president: "Let's go to Omaha for a meeting and come to a consensus on this competitive practice." Plaintiff also cites to a letter to Central National, written after the August 4, 1983 meeting in which Van Wagenen's attorney complained that Central National had not adhered to "the agreement which you have with Van Wagenen." Thus, there is conflicting evidence concerning the existence of any agreement or extension of that agreement to RVI. Assuming plaintiff is able to provide evidence to support each of the remaining elements of its claim, the existence of an issue as to the existence of an agreement between Central National and Van Wagenen would be sufficient to preclude this Court from granting defendants' motion for summary judgment.

**B. Existence of a Conspiracy**

■ Defendants' contend that, even if there was an agreement between Van Wagenen and Central National, that agreement could not constitute an antitrust conspiracy. In *Copperweld v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court held that, as a matter of law, a parent corporation and its wholly-owned subsidiary are not capable of conspiring in violation of § 1 of the Sherman Act, since there is a complete unity of economic interest between the two entities and, therefore, an agreement would not result in a "sudden joining of economic resources that had previously served different interests...." *Id.* at 771, 104 S.Ct. at 2741.

The *Copperweld* doctrine has been extended to sister corporations, *Hood v. Tenneco Texas Life Ins. Co.,* 739 F.2d 1012, 1015 (5th Cir.1984); to commonly-owned corporations, *Century Oil Tool, Inc. v. Production Specialties, Inc.,* 737 F.2d 1316, 1317 (5th Cir.1984); and to a corporation and certain agents who function as an integral part of the corporate entity, *Pink Supply Corp. v. Hiebert,* 788 F.2d 1313, 1316 (8th Cir.1986); *See also Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1223 (8th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988). The court in *Ryko* held that there was a unity of economic interest between a manufacturer and its separately incorporated distributor—thereby precluding the possibility of an antitrust combination or conspiracy—since the "manufacturer b[ore] the financial risks of transactions with the customers and continue[d] to retain 'title, dominion and control over its goods' then it is likely that the distributor is merely an agent for the manufacturer." 823 F.2d at 1223 (citations omitted). The court noted that the analysis of the relationship between the two entities was limited to those

transactions allegedly involving an antitrust violation, and recognized that a distributor may act as a manufacturer's agent and be incapable of conspiring when performing certain duties in a business relationship, but as an independent entrepreneur, and thus capable of conspiring, when performing other duties. *Id.* at 1223–24.

In this case there is evidence that, as a general proposition, a carrier retains complete control over: whether or not to accept business written by the carrier's managing general agent; the nature of the coverage provided; and whether or not to honor a claim. There is also evidence, however, that much of this decision making authority may be delegated to the managing general agent. (depo. of Michael J. Miller at 30–71). In a relationship where a carrier retains the right to accept or reject business written by its managing general agent, the right to determine the nature of the coverage provided and the risk of covering a loss covered by a policy, the relationship would be analogous to that of a manufacturer that employs distributors on a commission basis for the sole purpose of obtaining sales. Such a relationship has been held to be one that cannot be deemed an antitrust combination or conspiracy. *See Ryko,* 823 F.2d at 1222–24.

In this case the parties have not specifically directed the Court to any evidence in the record detailing the terms of the business relationship between Central National and Van Wagenen or any of the other defendants. Nor have the parties directed the Court to evidence concerning the functions that each entity performed. Without a clear detailed understanding of the relationship between the entities, the Court cannot determine whether there is the kind of unity of economic interests between the defendants that would preclude a finding that they had the capacity to enter into an antitrust combination or conspiracy, thus precluding summary judgment on the basis of their incapacity to conspire.

## C. Nature of the Restraint

■ Assuming plaintiff successfully establishes the existence of an agreement between defendants with the capacity to enter into an antitrust combination or conspiracy, the Court must find that the concerted action unreasonably restrained trade or must grant defendants' motion for summary judgment. If the alleged restraint falls within that category of agreements that have been held to be *per se* unlawful, plaintiff need not provide any evidence of the economic effects of the alleged restraint in order to establish its unreasonableness. Otherwise, to avoid summary judgment, plaintiff must provide evidence sufficient to create a question of fact as to the unreasonableness of the restraint.

Plaintiff contends that the restraint at issue in this case is a horizontal group boycott or refusal to deal similar to the agreement held to be unlawful *per se* in *Klor's v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The restraint is a horizontal boycott or refusal to deal, according to plaintiff, because Van Wagenen and Central National, acting through Action, were competitors at the same level of distribution. Citing *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988), defendants respond that the conspiracy, as alleged by plaintiff, would be a vertical restraint subject to analysis under the rule of reason.

The Court concludes that the evidence submitted, at most, *could* establish the existence of an agreement between Van Wagenen and Central National. There is no evidence, however, of a direct agreement between Van Wagenen and Action or any other defendant at the same level of distribution. Without such evidence the Court finds that the restraint is vertical in nature and, therefore, must examine the alleged concerted action under the rule of reason. *See Ryko Mfg. Co.,* 823 F.2d at 1230.[5]

---

**5.** The facts in *Ryko* are similar to those of the present case. There, plaintiff argued that exclusive territorial provisions in Ryko's distributorship contracts violated Section 1 of the Sherman

Act. Plaintiff argued that the exclusive territorial provisions should be stricken as *per se* illegal horizontal agreements between competing distributors, because *Ryko* acted as its own distrib-

### D. Reasonableness of the Restraint

■ Having determined that analysis under the rule of reason is required, the Court must then evaluate the evidence submitted to determine whether the alleged concerted action unreasonably restrains trade. Defendants contend that since plaintiff has not attempted to provide evidence necessary to a rule of reason analysis, relying solely on its contention that the restraint at issue was illegal *per se*, their motion for summary judgment must be granted.

The relevant inquiry here, when vertical non-price restraints are alleged, is whether Central National or National Underwriters have any significant market power in the interbrand market. *Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 315–17 (8th Cir.1986). A finding of no interbrand market power precludes any need to further balance the competitive effects of a challenged restraint. *Id.* at 316.

In order to establish that Central National has market power, plaintiff must show that it has a dominant market share in a well-defined relevant product and geographical markets. *Id.* at 318. None of plaintiff's experts, however, have conducted a rule of reason analysis; there has been no attempt to define the relevant market or to provide data concerning the structure of that market. There is some evidence that at one time Central National, as a result of Van Wagenen's efforts, wrote at least 80% of the collateral protection insurance in Minnesota. Plaintiff has not directed the Court to any similar data with regard to RVI. Nevertheless, assuming Minnesota is the relevant market, plaintiff's own expert testified that normally other insurance carriers could enter Minnesota relatively easily. Such ease of entry into a new market prevents the acquisition of market power. In the absence of any evidence—other than scattered unfounded statements—concerning market definition and market share, the Court cannot conclude that a genuine issue of fact exists as to Central National's market power. Without sufficient evidence to create an issue as to Central National's market power, the Court cannot conclude, under a rule of reason analysis, that the alleged concerted action was unreasonable and, therefore, must grant defendants' motion for summary judgment on plaintiff's claims under § 1 of the Sherman Act and Minn.Stat. §§ 325D.51 and 325D.53, subd. (3).

### II. *Breach of Contract*

■ King Agency alleges that it had contracts with Action to market and sell CPI and RVI, and that by those contracts Action promised to provide an insurer for any CPI or RVI policies King Agency sold. King Agency asserts that on or about October 28, 1982, Action and King Agency entered into an oral agreement in which King Agency agreed to promote, market, and sell Action's CPI program and that, in reliance on that contract, King Agency expended substantial amounts of time and effort in promoting, marketing, and selling Action's CPI program.

On May 27, 1983, King Agency and Action reduced the oral agreement to writing by executing a sub-agent agreement concerning the marketing of Action's CPI program. The effective date of the agreement was April 1, 1983. No termination date was specified. By the agreement, King Agency was authorized to offer CPI to banks and credit unions within Minnesota in exchange for a commission of five percent of the net premium. Action further promised that it would "supply the insurer for this program to be approved by Producer [King Agency]." At the time the agreement was executed, Central National had not yet acquired Action and Action used a number of carriers to underwrite it's CPI program.

After Central National acquired Action in June 1983, Central National became Action's sole underwriter for its CPI program. Further, King Agency's authority to market CPI underwritten by Central Na-

---

utor in territories where it had no other. The Eighth Circuit summarily rejected this argument, hold that "the better-reasoned cases exam-

ine nonprice restraints in the dual distribution context under the rule of reason." *Id.*

tional was gradually restricted, and finally terminated in late 1983. Action, however, did provide a carrier for the two CPI policies King Agency sold.

On April 17, 1984, King Agency and Action executed an Addendum to the May 27, 1983 agreement. By that addendum, King Agency was authorized to market and sell Payment Shaver, National Underwriters form of RVI, in exchange for a five percent commission. After the addendum was executed, King Agency began marketing Payment Shaver RVI to over fifteen different banks in Minnesota, including the two largest bank holding companies, Norwest and First Bank Systems. King Agency sold a Payment Shaver RVI policy to American Bank of St. Paul and presented that contract to Action. National Underwriters refused to accept the proposed contract, however, stating in a May 25, 1984 letter to King Agency that the proposed contract was being rejected because Department of Insurance approval had not been received for its new rate filings and because King Agency's sub-agency agreement with Action had not yet been finalized. In that same letter, National Underwriters rejected a proposed contract for Payment Shaver RVI that King Agency had nearly finalized with Norwest Banks. National Underwriters' stated reason was that the changes in the Payment Shaver RVI program proposed by Norwest were unacceptable to National Underwriters.

King Agency contends that Action breached its contractual obligation to provide a carrier for any RVI or CPI policies it sold. According to King Agency, Action was obligated to provide a carrier even though Central National refused to underwrite any CPI policies sold by King Agency to Minnesota banks and even though National Underwriters refused to underwrite RVI policies sold by King Agency to Minnesota banks.

Action responds that neither the May 27, 1983 sub-agency agreement nor the April 17, 1984 Addendum obligated it to guarantee an insurance company for King Agency on any business it wanted to write on any accounts in the State of Minnesota. In support of this contention, Action argues that the May 27, 1983 sub-agency agreement and the April 17, 1984 Addendum were incomplete expressions of the intent of the parties as to their respective duties and obligations and, therefore, the agreement must be interpreted in light of customary industry practice. Industry practice, according to Action, precludes a finding that Action ever guaranteed to King Agency an insurer for any RVI or CPI policies sold. In the alternative, Action argues that, even if it initially had a contractual obligation to provide a carrier for any CPI or RVI policies King Agency sold, Action always retained the *power* to instruct King Agency not to solicit business in particular banks or particular states.

Action essentially contends that the language of the May 27, 1983 sub-agency agreement is ambiguous, and, therefore, the Court must resort to extrinsic evidence to determine the parties' intent. "Whether a contract is ambiguous is a legal determination in the first instance. If the language used is reasonably susceptible of more than one meaning, an ambiguity exists and courts may resort to extrinsic evidence of intent to construe the contract." *Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn.1982).

After examining the May 27, 1983 sub-agency agreement, and, in particular, that portion of the agreement stating that Action "will supply the insurer for this program to be approved by Producer," the Court concludes that it is reasonably susceptible of more than one interpretation. The agreement suggests that, without limitation, Action will provide an insurer. The absence of any language limiting Action's obligation to provide the insurer, combined with the absence of any identification of the insurer to be used and King Agency's power to approve the insurer, suggests that there were alternative carriers that may or could be used by Action. That same language, however, is also capable of being interpreted as obligating Action to provide a single insurer for its entire CPI program ("AFS will supply *the* insurer for *this* program"), rather than any insurer for

any CPI policy King Agency was able to write. The language can further be interpreted as leaving open the parties' intent in the event the approved carrier refused the proposed contract.

Once the Court determines, as a matter of law, that a contract is ambiguous and that extrinsic evidence is needed to determine the intent of the parties, the construction of that contract becomes a question of fact for the jury, unless the evidence is conclusive. *Donnay v. Boulware*, 275 Minn. 37, 44, 144 N.W.2d 711, 716 (1966). In this case the evidence is not conclusive. There is evidence that, prior to its acquisition by Central National, Action used multiple carriers to underwrite CPI policies, providing support for the interpretation that Action had obligated itself to provide a carrier for any CPI policies sold by King Agency. Further, Joe Taborek, an independent regional representative for Action, testified at his deposition that, based on his experience in the insurance business, the language at issue in the May 27, 1983 agreement bound Action to produce some kind of insurer to underwrite the collateral protection product for banks or financial institutions secured by a sub-agent.

There is, however, also evidence of industry custom that contradicts this interpretation. Specifically, several experts testified that is understood in the industry that underwriters can accept or reject any piece of business they choose. In light of such discretion, most agents, such as Action, would not guarantee a carrier for any policy a sub-agent might sell. Thus, a jury could also reasonably find that the parties did not intend to obligate Action to provide a carrier for any CPI policy sold by King Agency. Because the evidence of the parties' intent is not conclusive concerning Action's obligation to provide a carrier for policies sold under its CPI program, the Court must deny Action's motion for summary judgment unless the Court finds that Action had the right to unilaterally modify the terms of the May 27, 1983 sub-agency agreement.

Several general principles are relevant to the modification of an agreement between a principal and agent. First, authorities distinguish between a principal's *power* to revoke an agent's authority and the *right* to revoke. " 'The principal has power to revoke ..., although doing so is in violation of the contract....' Exercise of the power of revocation where no corresponding right exists exposes the actor to liability." *Klawitter v. Billick*, 308 Minn. 325, 242 N.W.2d 588, 592 (1976). Sales agency and distribution agreements, however, are ordinarily terminable at will if they do not contain express provisions for duration or termination. *See Benson Coop. Creamery Ass'n v. First Dist. Ass'n.*, 276 Minn. 520, 151 N.W.2d 422, 426 (1967).

Second, if an agency agreement is an enforceable bilateral contract, the principal does not have the unilateral right to modify the agreement. Although a mere executory agreement between a principal and agent, terminable at will, may be unilaterally modified by the principal without giving rise to liability, the rule is opposite once the agent undertakes performance. *Klawitter*, 242 N.W.2d at 592.

Finally, if the principal breaches the agency agreement, the agent is entitled to receive either the amount of the net loss caused or the gains prevented by the breach or the reasonable value of the services rendered.

In this case, neither the May 27, 1983 sub-agency agreement or the April 17, 1984 addendum specified a date for the termination of the agency relationship between Action and King Agency. Thus, King Agency's authority to act on behalf of Action was terminable at will. Since King Agency's agreement with Action authorized King Agency to solicit CPI policies only from financial institutions within the State of Minnesota, Action's order that King Agency could no longer contact financial institutions within the State of Minnesota was essentially a termination of the agency relationship with regard to CPI.

Because the agreement was terminable at will, Action cannot be held liable for any profits King Agency may have been prevented from obtaining by beginning to market the product to financial institutions that

had not previously rejected King Agency's efforts after the date Action terminated King Agency's authority to sell CPI within the State of Minnesota. There is evidence that King Agency undertook performance under the May 27, 1983 sub-agency agreement. Thus, Action did not have the right to unilaterally modify the terms of the agreement with regard to any sales King Agency may have obtained as a result of marketing efforts begun before the termination of the agreement.

Action argues that it had the right to unilaterally modify the agreement if it could show reasonable cause. *See Klawitter*, 242 N.W.2d at 593. Based on the evidence presented, the Court, however, finds that Action did not have good cause to refuse to supply an insurer other than Central National. Even though Central National had acquired Action, there is no evidence to suggest that Action could not have fulfilled its obligation to provide an insurer by going to another underwriter until such time as Action could terminate the agency relationship without liability.

Thus, assuming that after trial the evidence supports the conclusion that Action had obligated itself to provide an insurer for King Agency on any CPI policies it was able to sell to financial institutions within the State of Minnesota, then King Agency must show that Action breached that obligation and the breach caused injury to King Agency. Upon examination of all the evidence submitted, the Court can find no evidence that Action's refusal to provide a carrier either before or after the May 27, 1983 subagency agreement was terminated caused any damage to King Agency. There is no evidence that King Agency presented any CPI contracts to Action that were not accepted. Further, records from King Agency's files reveal that King Agen-

cy contacted numerous banks without making a sale. King Agency has not contradicted this evidence by directing the Court to any evidence that they had any potential sales. Without evidence of any damages to King Agency resulting from Action's refusal to provide a carrier for CPI policies sold by King Agency[6], the Court must grant Action's motion for summary judgment on King Agency's claim for breach of the CPI sub-agency agreement.

**B. Residual Value Insurance**

■ The contract between Action and King Agency concerning King Agency's authorization to market RVI does not suffer from the same ambiguity as the agreement concerning King Agency's authority to market CPI. The agreement must be read as a whole, including both the May 27, 1983 sub-agency agreement and the April 17, 1984 addendum. While the language concerning Action's obligation to supply the insurer for the RVI program is incorporated by reference, the addendum makes clear that the "program" King Agency is authorized to market is Payment Shaver RVI, a particular brand of RVI developed by National Underwriters. Thus, under the clear language of the May 27, 1983 agreement and the April 17, 1984 addendum, Action was obligated to present potential RVI contracts only to National Underwriters. Damages, then, are limited to those attributable to Action's failure to submit any potential RVI contracts to National Underwriters.

There is, however, no evidence of such damages. Plaintiff alleges that in May 1984, defendants announced that King Agency could not market anything to anyone in Minnesota, or to First Bank and Norwest Banks, wherever located. Thus, as of May 1984, Action had effectively ter-

---

**6.** King Agency's primary evidence concerning damages is contained in the November 1, 1987 affidavit of Andrew Whitman, one of plaintiff's experts. Whitman calculated King Agency's lost commissions for potential sales of CPI at $350,-584 for the period 1982–1986. There is no breakdown of commissions lost yearly. Whitman made a similar calculation for lost commissions on the sale of RVI for the period 1984–1988 and concluded it was $283,875.

There is no yearly breakdown of lost commissions for RVI. Further, Whitman's calculations are based on an assumption that King Agency would have a 25 percent market share. Based upon the uncontradicted evidence that King Agency was unable to obtain more than a handful of sales from numerous contacts, the Court finds that Whitman's calculated damages are wholly speculative.

minated its agency relationship with King Agency. Accordingly, the only period in which King Agency may recover damages for lost RVI sales is from April 17, 1984 to termination of the agency relationship in May 1984. Once again, there is no evidence of any damage from Action's refusal to submit potential RVI contracts secured by National Underwriters. King Agency presented only one RVI contract for acceptance. Although National Underwriters refused to accept the proposed contract, Action was not contractually obligated to ensure that National Underwriters accepted the proposed contract. King Agency has alleged that only one other potential client for RVI existed, Norwest Bank in Minneapolis. The uncontradicted evidence concerning this potential sale reveals, however, that National Underwriters also rejected this proposed contract, since the sale was conditioned upon National Underwriters making various changes in coverage for the program. National Underwriters was unwilling to make the requested changes. Thus, since Action was not obligated to submit potential RVI contracts to any carrier other than National Underwriters, there is no evidence of any breach of the RVI sub-agency agreement and no evidence of damages even if there was a breach. Accordingly, Action's motion for summary judgment on King Agency's claim for breach of the RVI sub-agency agreement must be granted.

### III. *Tortious Interference With Economic Relations*

Plaintiff alleges that defendants Van Wagenen, Central National, and Drum tortiously interfered with Action's performance of its economic relations with King Agency by, among other things, inducing Action to breach its CPI and RVI contracts and cease doing business with King Agency. Each of these defendants asserts that it was privileged to interfere with the alleged contracts.

■ Elements of the tortious interference cause of action are:

(1) a contract was in existence at the time defendants engaged in a challenged conduct;

(2) defendants knew of the contract;

(3) defendants intentionally and without justification procured breach of the contract; and

(4) plaintiff suffered injuries as a direct result of defendants' actions.

*Furlev Sales & Associates, Inc. v. North American Automotive Warehouse, Inc.,* 325 N.W.2d 20, 25 (Minn.1982).

### A. Competition Privilege

■ Van Wagenen has moved for summary judgment on King Agency's claims for tortious interference on the grounds that Van Wagenen was unaware of the terms of Action's contract with King Agency and Van Wagenen is a competitor of plaintiff and thus is protected by the competition privilege to the economic interference tort. The elements of the "competition" privilege relied upon by Van Wagenen are derived from the Restatement of Torts, § 768, and were set forth in *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628 (Minn.1982):

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if:

(a) the relation concerns a matter involved in the competition between the actor and the other;

(b) the actor does not employ wrongful means;

(c) his action does not create or continue an unlawful restraint of trade; and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interfer-

ence if the contract is not terminable at will.

*Id.* at 633.

In this case, the economic relationship alleged to have been interfered with concerned the sale of collateral protection and residual value insurance and was terminable at will. The sale of CPI and RVI are matters within the ambit of competition between King Agency and Van Wagenen. Further, there is no evidence that Van Wagenen used wrongful means to achieve the alleged interference and this Court has now held that the alleged interference did not constitute an unlawful restraint of trade. Finally, the Court finds that Van Wagenen's desire was to protect its position as Central National's leading agent in Minnesota. Thus, even if the Court were to find that Van Wagenen interfered with King Agency's economic relationship with Action, the Court concludes that Van Wagenen's conduct was privileged. Accordingly, the Court must grant Van Wagenen's motion for summary judgment on King Agency's claims for tortious interference of economic relations.

### B. Superior Financial Interest Privilege

 In a brief footnote, without citing a single case in support of the proposition, Drum and Central National assert that the *Copperweld* doctrine should be extended to preclude a finding that they, as sister and parent corporations, are not entities sufficiently separate from Action such that they can be held liable for interfering with Action's alleged contract with King Agency. Plaintiff correctly notes that there are no Minnesota cases supporting defendants' argument. In fact, other jurisdictions have rejected analogous arguments. *E.g. Phil Crowley Steel Corp. v. Sharon Steel Corp.* 702 F.2d 719, 722 (8th Cir.1983); *Peacock v. General Motors Acceptance Corp.,* 432 So.2d 142, 143 (Fla. Dist. Ct.App.1983).

The Court's own time-consuming research on behalf of the parties, however, has revealed that courts in other jurisdictions are in agreement that a parent corporation may be justified in, or privileged to, interfere with the subsidiaries' contracts. *E.g., Deauville Corp. v. Federated Dep't Stores, Inc.,* 756 F.2d 1183, 1196 (5th Cir. 1985) (Under Texas law, a plaintiff cannot recover for tortious interference with a contract if the alleged interfering party had a financial interest superior to that of one of the parties to the contract—such as stock ownership of one of the parties—and acted to protect its own interest); *Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 702 F.2d 719, 722 (8th Cir.1983) (Under Missouri law, "[a] corporation with a financial interest in another corporation is deemed to be justified unless it is shown that the partner employed wrongful means or acted with an improper purpose."); *Record Club of America, Inc. v. United Artists Records, Inc.,* 611 F.Supp. 211, 217 (S.D.N.Y.1985) ("Under New York law, one who has a financial interest in the business of another is privileged to interfere with a contract between the other and a third party *if* his purpose is to protect his own interests and if he does not employ improper means."); *Heavener, Ogier Servs, Inc. v. R.W. Florida Region, Inc.,* 418 So.2d 1074 (Fla.Dist.Ct.App.1982) ("if a defendant interferes with a contract in order to safeguard a preexisting economic interest of his own, the defendant's right to protect his own established economic interest outweighs the plaintiff's right to be free of interference, and his actions are usually recognized as privileged and nonactionable"); *Bendix Corp. v. Adams,* 610 P.2d 24, 30–31 (Alaska 1980) (The privilege to interfere in business relations in order to protect an investment applies to existing contracts provided the corporation's conduct is motivated by its desire to protect its economic interest.); *see also* Restatement (Second) of Torts §§ 767 and 769 (1977).[7]

**7.** Restatement (Second) of Torts § 769 (1977) provides:

> One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not

interfere improperly with the other's relation if he
> (a) does not employ wrongful means and
> (b) acts to protect his interest from being prejudiced by the relation.

The courts have denominated this privilege the "superior financial interest privilege."

■ While, to date, there are no Minnesota cases recognizing this privilege, given its roots in the Restatement and consistent recognition in the case law, this Court concludes that it is applicable in this case. Thus, to define the privilege applicable to this case more precisely, the Court holds that a parent is privileged to, or justified in, interfering with the contracts of its wholly-owned subsidiary provided it does not use wrongful means and acts to protect its economic interests. This determination is a question of fact for the jury. *Deauville Corp.*, 756 F.2d at 1197. Since neither party has briefed this issue or directed the Court to any evidence supporting or refuting the existence of the privilege, the Court will deny Central National's motion for summary judgment.

Further, the Court's research has not revealed any cases extending the superior financial interest privilege to sister corporations. Even if there were precedent to support extension of the privilege to sister corporations, Drum has not directed the Court to any evidence showing the nature or extent of Drum's interest in Action. Accordingly, Drum's motion for summary judgment must be denied as well.

By its terms, however, § 769 applies only to prospective contractual relations. Comment b to § 769 confirms that § 769 "does not apply to the causing of a breach of contract," but further states that "[t]his does not imply, however, that the actor's interference is necessarily improper in such a case under the general principle stated in § 767." Despite the explicit language in Comment b, several courts have relied upon § 769 to support their conclusion that a parent corporation may be privileged to interfere with its wholly-owned subsidiary's contracts. *See e.g., Phil Crowley Steel Corp*, 702 F.2d at 722; *Geib v. Alan Wood Steel Co.*, 419 F.Supp. 1205, 1209 (E.D.Pa.1976) (The privilege under § 769 is available to a defendant when the contract at issue is terminable at-will, since termination of an at-will contract does not constitute a breach of that contract). Other courts, however, have heeded the explicit language of Comment b and have held that, under a balancing of the factors listed in § 767, the privilege still is available. *See e.g., Bendix*, 610 P.2d at 30–31.

Restatement (Second) of Torts § 767 (1977) provides:

## IV. *Unfair and Deceptive Acts*

■ In Count V of the Amended Complaint, plaintiff alleges in conclusory terms that the acts committed by Van Wagenen, Central National, Drum, and Action "constitute unfair methods of competition and unfair and deceptive acts and practices." Amended Complaint ¶ 95. Previously, defendants moved to dismiss this claim on the grounds that it failed to allege conduct falling into one of the twelve categories of deceptive trade practices enumerated in Minn.Stat. § 325D.44, subd. 1(1)–(12). The Court acknowledged that the claim was deficiently plead, but concluded that the appropriate remedy was to afford plaintiff an opportunity to amend the Complaint. *James M. King and Assocs., Inc. v. G.D. Van Wagenen Co.*, No. 4–86–461 (D. Minn. Jan. 5, 1987). Plaintiff amended its Complaint, but did not amend its claim to conform to the requirements of § 325D.44 within the 30 days allowed. Defendants have renewed their motion to dismiss because of plaintiff's failure to amend its claim within the time allowed or, in fact, to amend it at all. That motion will be granted.

## V. *Punitive Damages*

■ Plaintiff asserts that each of the defendants acted with willful indifference

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct

(b) the actor's motive

(c) the interests of the other with which the actor's conduct interferes

(d) the interests sought to be advanced by the actor

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other

(f) the proximity of remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

Generally, each of these factors must be balanced in each case, unless judicial decisions indicate the existence of a more or less crystallized rule or privilege. Restatement (Second) of Torts § 767 comment j (1977).

to its rights, entitling it to an award of punitive damages. Minn.Stat. § 549.20 (1986) governs the availability and amount of punitive damages. Under § 549.20, punitive damages are not available for breach of contract unless the breach is accompanied by an independent tort. *Barr/Nelson, Inc. v. Tonto's, Inc.*, 336 N.W.2d 46, 52 (Minn.1983). Punitive damages, however, are available in actions for intentional interference with contractual relations where defendant's willful indifference is established by clear and convincing evidence. *Potthoff v. Jefferson Lines, Inc.*, 363 N.W.2d 771, 777–78 (Minn. Ct.App.1985).

Defendants assert that plaintiff's claim for punitive damages must be dismissed because there is no evidence that they acted with willful indifference. Plaintiff responds that the existence of malice is a question of fact precluding summary judgment. Plaintiff, however, has not met its burden of setting forth specific facts demonstrating that there is a genuine issue for trial as to whether defendants acted with willful indifference, Fed.R.Civ.P. 56, and instead, rested only upon its allegation that defendants acted with willful indifference. Without citation to specific facts in the record supporting its assertion that defendants acted with willful indifference, defendants' motion for summary judgment on plaintiff's claim for punitive damages must be granted.

Accordingly, for the reasons stated above, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment on Counts III and VIII of the Amended Complaint is granted;

2. Defendants' motion for summary judgment on Counts I and VI of the Amended Complaint is granted;

3. Defendant Van Wagenen's motion for summary judgment on Counts II and VII of the Amended Complaint is granted;

4. Defendants Central National and Drum's motion for summary judgment on Counts II and VII of the Amended Complaint is denied;

5. Defendants' motion for summary judgment on Count X of the Amended Complaint is granted;

6. Defendants' motion to dismiss Count V of the Amended Complaint is granted; and

7. Counts IV and IX are dismissed.